Bernice **CANTILE, Individually and d/b/a Menger Smart Shops and as Executrix of the Estate of Beryl H. Cantile, Deceased, Appellant,**

v.

**VANITY FAIR PROPERTIES, Appellee.**

No. 15110.

Court of Civil Appeals of Texas,
San Antonio.

April 18, 1973.

Rehearing Denied Jan. 30, 1974.

James F. Gardner & Associates, San Antonio, for appellant.

Berman, Fichtner & Mitchell, Dallas, for appellee.

CADENA, Justice.

This is an appeal by defendant, Bernice Cantile, d/b/a Menger Smart Shops, who also appears as independent executrix of the estate of her deceased husband, Beryl H. Cantile, from a judgment awarding plaintiff, Vanity Fair Properties (described in the pleadings as a joint venture consisting of Robert C. Hoppe, Stanley Hickman, Anthony Atwell and William Ravkind), judgment in the sum of $16,170 as rental for certain premises occupied by Menger Smart Shops under a written lease and abandoned prior to the expiration of the term, and $16,000 as attorney's fees. By cross-points, Vanity Fair Properties contends that the trial court should have entered judgment in its favor in the sum of $83,304 as damages for breach of the lease agreement, and in the amount of $30,000, the sum found by the jury to be reasonable, as attorney's fees.

Plaintiff, Vanity Fair Properties, will be designated in this opinion as "lessor," while defendant will be referred to as "lessee."

Lessor filed this suit on October 13, 1969. The trial on the merits began on October 5, 1971, and the judgment before us for review was rendered on December 9, 1971.

The lease in question, executed on October 5, 1964, called for lessee to occupy 3,300 square feet of space in a building to be subsequently constructed by lessor in San Antonio. A sketch or plat attached to the lease identifies the building as "VANITY FAIR SHOPPING CENTER and Professional Building." The annual fixed minimum rent reserved was $12,600, payable in equal monthly installments of $1,050, in advance, on the first day of each month. The lease also provided for an additional rental payment equivalent to the amount, if any, by which 4% of the gross receipts from lessor's business exceeded the annual fixed minimum rent. The term of the lease was ten years, terminating on July 31, 1976.

By subsequent amendment to the lease, executed prior to the time lessee took possession, the leased area was increased to 4,500 square feet, and the minimum rental was increased to $1,350 per month. This amendment further provided that if, at the termination of the first three years of the basic term, lessee was paying no additional rental under the percentage of gross receipts provision of the original lease, lessee would have the option of returning " . . . the 1200 additional feet . . . " or paying " . . . the sum of an additional One Hundred Twenty ($120.00) Dollars per month therefor for the balance of the lease. . . ."

It is undisputed that no additional amounts were paid by lessee under the gross receipts provision, since 4% of the lessee's gross receipts never exceeded the fixed minimum rental reserved in the lease.

The last payment of rent by lessee was made on February 1, 1969. Lessee abandoned the premises on February 27, 1969.

Lessor's petition, after reciting the execution of the lease and abandonment of the premises by lessee on February 27, 1969,

contained allegations which may be fairly summarized as follows:

(1) Lessor suffered total loss of rentals for March, April and May, 1969, totaling $4,050.

(2) On May 15, 1969, lessor relet 1,500 square feet of the area formerly occupied by lessee. In order to make the premises useable by the new tenant, lessor made alterations at a cost in excess of $5,300.

(3) In addition to the sums "heretofore mentioned," lessor had suffered damages in the amount of $5,400 as of the date on which the petition was filed (October 13, 1969).

(4) Lessor would continue to be damaged in the sum of $1,350 per month until July 1, 1976, the date of expiration of the lease term.

(5) Lessor was entitled to recover attorney's fees. A reasonable attorney's fee would be one third of the amount sued for, or a fee calculated on the basis of no less than $50 per hour for time devoted by lessor's attorney in the preparation of pleadings, pretrial proceedings, preparation for trial, trial on the merits and appeal to the Supreme Court of Texas or of the United States, if such appeal should be necessary. Since lessor sought recovery of an amount no less than the amount of " . . . delinquent rentals to the termination of the lease contract or approximately seven years of rentals at $16,200.00 per year, or $113,400.00 . . .," a reasonable attorney's fee would be $37,800.

Lessor prayed for recovery of delinquent rentals, cost of improvements and remodeling, attorney's fees and interest. The prayer concluded with the usual demand for general relief.

Although 67 special issues were submitted to the jury, the last 65 issues, which were answered unfavorably to lessee's prayer for recission of the lease because of fraud, are not before us. In answer to the first two issues, the jury found that the

"reasonable cash market value" of the lease for use as a ladies' ready-to-wear shop was "none," and that $30,000 would be a reasonable attorney's fee.

The judgment, after setting out the answers to the special issues, recited that the court was nevertheless of the opinion that lessor was entitled to recover rentals for the 13-month period beginning March 1, 1969, and ending March 31, 1970, at the rate of $1,470 per month.

Lessee's motion for new trial was overruled as to all points challenging the award to lessor of recovery of rent. Lessee's complaints relating to the award of $30,000 as attorney's fees were sustained, with the provision that if lessor filed a remittitur in the sum of $14,000, these assignments of error would also be overruled. The lessor filed the remittitur, reducing the award of attorney's fees to $16,000.

By its first point, lessee contends that the lease terminated as a matter of law when lessee vacated the premises on February 27, 1969, because of the change in the nature of the first floor of the building in which the premises were situated from "that of a shopping center" to an office building. This point is without merit.

Although the lease instrument expressly limits lessee's use of the premises to the operation of a ladies' ready-to-wear shop, the instrument contains no language imposing on lessor the duty to maintain the first floor of the building as a shopping center or prohibiting the lease of space on the first floor to other than retail establishments. Since it is undisputed that all parties to the lease contemplated that the ground floor of the building would be developed as a "fashionable, boutique-type shopping center," and since, after the first floor was completed, the entire space was occupied by tenants operating retail establishments, lessee insists that there was an implied agreement by lessor to maintain the "shopping center" character of the first floor, and that its breach of this

agreement terminated lessee's obligation to pay rent.

Because of historical reasons, the effect of the breach of his obligations by a party to a lease was determined by reference to the rules of real property relating to the eviction of, or the commission of waste by, the tenant. The application of these rules generally led to the conclusion that the obligations of lessor and lessee were "independent" in the sense that failure of one party to perform did not excuse performance by the other. 1 Restatement, Contracts, Section 290 (1932). However, under pressure of changing economic and social conditions, the courts, more and more, have shown a willingness to treat the obligations of the parties as mutually dependent. Some courts have achieved this transition within the apparent framework of property rules by resorting to fictions, such as the doctrine of constructive eviction. Other courts have reached the desired result simply and logically, as did the Court in Ingram v. Fred, 210 S.W. 298, 300 (Tex.Civ.App.—Fort Worth 1919, writ ref'd), by applying ordinary contract rules applicable to interdependent promises. See, generally, Hicks, The Contractual Nature of Real Property Leases, 24 Baylor Law Rev. 445 (1972).

However, at least where commercial leases are concerned, almost all of the cases which have treated promises of lessors and lessees as being mutually dependent, so that breach by one party excuses performance by the other, have involved breaches of express covenants which were viewed as going to the whole consideration because they were considered important by the parties. See, for example, Lilac Variety, Inc. v. Dallas Texas Co., 383 S.W.2d 193 (Tex.Civ.App.—Dallas 1964, writ ref'd n. r.e.). This is true whether the conclusion as to mutuality was dressed up in property language or was expressed in terms of well-settled contract principles. Hicks, op. cit., at 454–69.

It is not necessary to decide whether, in a commercial lease situation, the breach of an implied promise by one party will relieve the other of the duty to perform. We merely hold that, in cases involving commercial leases, where, as here, parties experienced in business transactions deal with each other at arms' length, are represented by attorneys, and the lease was executed only after several conferences resulting in additions to and deletions from the original proposal, testimony by one of the parties that he considered important an alleged agreement which was not incorporated in the lease does not conclusively establish that the breach of the alleged implied agreement goes to the whole consideration. No issues relating to this defensive theory were submitted to the jury, and lessee does not here complain of the trial court's failure to submit such issues.

While there is testimony to the effect that the change in the character of the ground floor area adversely affected lessee's business, there is also testimony from which it can reasonably be concluded that lessee was realizing a profit normal for the type of business which it was conducting. The evidence does no more than, perhaps, raise a fact issue as to whether the change in the character of the building made the premises unfit for the purpose for which they were leased. This fact issue was not submitted to the jury for resolution.

Lessee next urges that the lease terminated by implied agreement when it abandoned the premises because the evidence establishes as a matter of law that lessor was guilty of conduct inconsistent with lessee's continued right of possession.

While the evidence conclusively establishes that, after abandonment by lessee, lessor relet portions of the premises, it cannot be said that such action on the part of lessor resulted, as a matter of law, in working a surrender of the lease, since the lease agreement expressly gave to lessor the right to relet in case of such abandon-

ment and expressly provided that such re-letting would not result in a termination of the lease. It may be that the testimony is sufficient to support a finding that, under the circumstances of this case, lessor's conduct was of such a nature as to bring about a termination of the lease, despite the express provisions of the lease agreement, but no issues aimed at a resolution of this factual question were submitted to the jury.

We do not agree with lessee's contention that the sale of the reversion by lessor, some months after lessee abandoned the premises, terminated the lease as a matter of law. It is elementary that the sale of the reversion by the landlord does not, of itself, bring about a termination of the lease. 1 American Law of Property, Section 3:59–.60, 3.63 (1952).

Lessee's second point is overruled.

Lessee's third, fourth, fifth, sixth, seventh and eighth points complain of the award of attorney's fees and will be discussed later.

Lessee's ninth point, complaining of the court's failure to sustain its objections to Special Issue No. 1, cannot be considered. The objections merely asserted that the special issue " . . . does not contain the proper legal measure of damages and further, does not comport to the measure of damages set forth in the basic lease," and that the accompanying instruction " . . . instructs the jury with reference to matters that are immaterial and irrelevant and not in any way tied into the measure of damages as set forth and spelled out in the lease and can not form the basis of a judgment." The objections do not point out the manner in which the issue incorrectly submitted the measure of damages, nor the respects in which it did not "comport" to the measure of damages set out in the lease. The objections do not point out the irrelevant and immaterial matters as to which the accompanying explanation incorrectly instructed the jury. The objection

was too general. Whitson Co. v. Bluff Creek Oil Co., 156 Tex. 139, 293 S.W.2d 488 (1956); Rule 274, Texas Rules of Civil Procedure.

Finally, lessee insists that lessor failed to establish the proper measure of damages. This point requires a review of the same evidence which must be discussed in connection with lessor's contention, under its first cross-point that, under the evidence and verdict, it was entitled to recover the sum of $83,304. For this reason, the two contentions will be discussed together.

A consideration of lessor's pleadings, Special Issue No. 1, and the argument advanced in support of lessor's first cross-point, makes it clear that lessor's claim is based either on the provisions of the lease giving to lessor the right to terminate the lease in case of lessee's default, or on the doctrine of anticipatory breach.

Section 19.02 of the lease contract, which gives lessor the right of termination following lessee's breach, provides that in such a case lessor is entitled to recover all damages suffered by him as a result of lessee's default. These damages are defined to include the cost of recovering the leased premises, reasonable attorney's fees, and ". . . the worth at the time of such termination of the excess, if any, of the amount of rent and charges equivalent to rent reserved in this lease for the remainder of the stated term over the then reasonable rental value of the leased premises for the remainder of the stated term, all of which amounts shall be immediately due and payable . . ." from lessee to lessor.

A review of the record leads to the conclusion that lessor failed to establish the reasonable rental value, as of the date of termination, of the leased premises for the remainder of the term.

Lessor's theory is that, under the terms of the lease, lessor was entitled to receive from lessee, for the unexpired portion of the term after lessee's default, rental pay-

ments totalling $130,230.[1] This figure is, itself, questionable, since it is based on the assumption that, beginning on August 1, 1969, the amount of the monthly rental payment would increase from $1,350 to $1,470 under the terms of the amendment to the lease adding 1,200 square feet to the space rented. That is, lessor assumed that for the months of March, April, May, June and July, 1969, the monthly rental which would become due would be $1,350 per month, while for the remaining 84 months of the term it was lessee's obligation to pay $1,470 per month. This assumption is based on the provision of the lease amendment which, insofar as applicable to the undisputed facts of this case, provided that on July 31, 1969 (the end of the first three years of the term), lessee would ". . . have the option to either return the 1200 additional feet or pay the sum of an additional One Hundred Twenty ($120.00) Dollars per month therefor for the balance of the lease . . ." Lessee abandoned the premises some five months prior to the date on which it was to exercise the option relating to the additional 1,200 square feet. Lessor's calculations, therefore, are based on the questionable assumption that lessee,

by abandoning the entire premises on February 27, 1969, exercised the option not to "return" the additional 1,200 square feet, but, instead, to retain the additional space and pay an increased rental.

The figure of $83,304 is obtained by subtracting $47,926, the net income realized from various relettings of portions of the premises, and assuming that the reasonable rental value of the premises for the remainder of the unexpired term is, as found by the jury, "none."

The conclusion that the premises had no reasonable rental value is based on the testimony of one of the partners in Vanity Fair Properties (lessor). He was asked whether, in his opinion, the lease has ". . . any cash market value for retail purposes since the [lessee] . . . moved out." He answered, "The . . . lease, it has no value, it's not paying any rental."

If it be assumed that lessor was attempting to calculate its damages according to the applicable provisions of the lease contract, it is clear that the question concerning the "cash market value for retail pur-

---

1. Lessor's claim that it is entitled to recover the sum of $83,304 is based on the theory that the extent of lessee's liability is to be measured by subtracting from the total rentals which lessor claims would have been paid under the lease ($130,230), the figure or sum of $47,296, which, according to lessor, is the net amount received by it as a result of reletting of portions of the space vacated by lessee. The details of these relettings may be summarized as follows:

1500 square feet of the area was rented on May 15, 1969, for a term ending in August, 1970, for a total rental of $8,400. From this amount lessor subtracted broker's fees in the sum of $1,701 and remodeling expenses of $6,084 paid by lessor, leaving a net income of $615 yielded by this subletting. From April, 1970, until August, 1970, a title company paid $5,000 for the use of the remaining 3,000 square feet. In connection with this reletting, lessor paid a broker's fee of $300, resulting in a net yield of $4,700.

After August, 1970, the entire premises remained vacant until September, 1971, when an insurance company rented 1,200 square feet of the area for a term expiring August 31,

1976, the termination date of lessee's term, for a total rental of $30,240, which was reduced to a net of $24,058 by subtracting broker's fees ($1,814) and remodeling costs ($5,368) paid by lessor. An advertising agency rented 1,800 square feet of the remaining 3,300 square feet, for a term beginning on November 1, 1971, and ending October 31, 1974, ten months prior to the expiration of lessee's term. The total rental called for under the terms of this lease is $26,400, which is reduced to a net income of $18,553 by deducting broker's fees ($1,584) and cost of remodeling ($6,263) paid by lessor.

At the time of trial, the remaining 1,500 square feet were yielding no money rental. This space was being occupied by a real estate firm which, apparently in return for the privilege of occupying space, rendered service in the form of managing the building for lessor. There is no evidence tending to indicate the value of the management services rendered by this "tenant." According to the testimony, this arrangement is "temporary," and the 1,500 square feet are available for use by a paying tenant.

poses" of the lease referred to the reasonable rental value of the premises, since this is the only pertinent inquiry under Section 19.02 of the lease. If the question was directed at ascertaining something other than the reasonable rental value of the premises, then it was irrelevant insofar as the question of damages as provided for in the lease is concerned.

Such testimony, even if the fact that it is opinion testimony given by an interested party is overlooked, is insufficient to support a finding concerning the reasonable rental value of the premises for the unexpired term. The fact that the witness explained his answer of "no value" solely by pointing out that the "lease" was "not paying any rental" compels the conclusion that the witness was testifying concerning the amount which lessor was receiving from lessee, rather than with reference to the reasonable rental value of the premises. This is the only possible explanation of his answer, since the undisputed evidence shows that at the time he testified, two thirds of the space formerly occupied by lessee had been relet, and the new tenants were paying rent. The premises, as distinguished from the lease, were yielding "rental." In addition, the remaining one third of the premises was occupied by a real estate firm, which while not paying money rental, was rendering services to lessor. It is obvious from testimony produced by lessor that the management services being rendered to lessor by the real estate firm were of value to lessor.

Since lessor gave lessee credit for the net rental received from the tenants occupying two thirds of the space, it may be reasonable to conclude that these portions of the premises had no reasonable rental value exceeding the amounts for which lessor's calculations gave lessee credit. But the same argument cannot be applied to the 1,500 square feet occupied by the real estate firm, since lessee was given no credit for the value of the services being rendered to lessor by such tenant. In view of the fact that the only value testimony in the record is not directed to the reasonable rental value of the premises, it must be concluded that lessor failed to establish the amount which must be deducted from the total rentals which lessee was obligated to pay, particularly as to the 1,500 square feet which must be considered either as being vacant or as yielding a rental in the form of services performed by the tenant.

There are two other weaknesses in lessor's argument. The testimony of the witness concerning value of the "lease" is based on the assumption that the premises can only be relet for occupancy by a retail establishment. We have rejected the contention, advanced by lessee and resisted by lessor, that the space in the building can only be let to retail establishments. The undisputed evidence establishes that the space is suitable for use for other purposes and that, in fact, it was, at the time of trial, being used by tenants for other purposes. Since there is no restriction on the use to which the premises may be put, a value opinion based on the assumption that the premises are restricted to use for retail purposes has no probative force.

Similarly, the jury's conclusion to the effect that the premises have no reasonable rental value is based on the court's instruction to the effect that the term " . . . cash market value . . . of the lease agreement . . . " refers to the reasonable rental value of the premises " . . . for use as a ladies' ready-to-wear shop . . . ." There is no justification for such a limitation on the inquiry concerning value. This reference to the form of Special Issue No. 1 is made solely for the purpose of pointing out that neither the verdict nor the evidence is sufficient to establish one of the essential elements of lessor's damages, that is, the reasonable rental value of the premises.

█ The same obstacles to lessor's success are met if it is assumed that the lessor, instead of relying on the lease provisions concerning damages, seeks recovery under the doctrine of anticipatory breach.

In addition, under that doctrine, as applied by this Court in Warncke v. Tarbutton, 449 S.W.2d 363, 364 (1970, writ ref'd n. r. e.), the pertinent inquiry would concern the *present* value of the total rent reserved. Under this doctrine, even if it be assumed that lessor correctly computed the gross payments due for the unexpired portion of the lease, the amount of damages would be calculated by subtracting the present value of the amount representing reasonable value from the *present* value of the sum, payable in five installments of $1,350 each and 84 installments of $1,470 each, of $130,230. Although *Warncke* speaks in terms of the difference between the reserved rental and " . . . the reasonable cash market value of the lease for its unexpired term," it is clear that "cash market value of the lease" refers to the "cash rental value of the leased premises for the unexpired portion of the term at the time of the breach." Rainwater v. McGrew, 181 S.W.2d 103, 105 (Tex.Civ. App.—Waco 1944, writ ref'd w. m.) ; San Antonio Brewing Ass'n v. Brents, 39 Tex. Civ.App. 443, 88 S.W. 368, 370 (—Austin 1905, writ ref'd) ; Anno: 137 A.L.R. 432, 446 (1942) ; 51C C.J.S. Landlord and Tenant § 250(2), pp. 661–662.

■ We uphold lessee's contention that the award of attorney's fees cannot stand. The only evidence pertinent to the question of attorney's fees, other than that detailing the work done by lessor's counsel, may be summarized as follows: If the fee is calculated solely on a "time" basis, including the time spent on the trial of the case, a reasonable fee would be $3,650. No evidence was introduced concerning the time which might be expended on possible appeals. The expert witness testified that if the legal services were rendered pursuant to a contingent fee arrangement a reasonable fee would be one third of the amount recovered. The witness did testify that "on a successful recovery," a reasonable fee, calculated on a contingent fee basis, would be $38,000. But this opinion was based on the assumption that lessor would recover $114,000, one third of which

would, indeed, be $38,000. The evidence does not reveal the nature of the fee arrangement between lessor and its attorney.

Even if this testimony is viewed in the light most favorable to lessor, a reasonable attorney's fee in this case would be $3,860, if the fee is calculated on a time basis, or one third of the amount recovered; that is, one third of $16,170. This evidence furnishes no basis for the jury's award of $30,000, nor can it support the award, following the remittitur, of $16,000. In so holding we necessarily overrule lessor's second cross-point, which asserts that lessor is entitled to recover $30,000 as attorney's fees.

Having concluded that the trial court committed error, we consider the question of the proper judgment to be entered by this Court. We are unable to ascertain the basis for the trial court's judgment that lessor recover $16,170 as rental. It is manifest that the judgment below is not based on the jury verdict. The judgment, after reciting the jury findings, continues: " . . . but the Court is of the opinion that Plaintiff is entitled to judgment for lost rentals only from March 1, 1969 through March 31, 1970 . . . IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Plaintiff . . . do have and recover . . . rentals in the sum of $1,470.00 per month, for March 1969 and each month thereafter through and including March 1970, the same amounting to $16,170.00 . . . ." The period described in the judgment is a period of 13 months, and rental for 13 months at the rate of $1,470 per month would total $19,110. Rental for five months at a monthly rate of $1,350, plus rental for eight months at a monthly rate of $1,470 would total $18,410. Rental for 13 months at the rate of $1,350 per month would amount to $17,550. The amount awarded, $16,170, happens to represent rental for 12 months at the rate of $1,350 per month.

We are unable to determine the basis for the action of the trial court in limiting lessee's liability, if such liability existed, to 13

months' rental. Lessee suggests that the court concluded that lessor sold the premises in April, 1970 (or March, 1970), and that such sale terminated lessee's obligation to pay rent. As already pointed out, the sale of the reversion does not terminate existing leases. In any event, lessor's right to damages, as opposed to accrued rentals, arose, if at all, prior to such sale.

It is apparent from the record in this case not only that the evidence is uncertain and, therefore, inadequate to afford complete data for judgment, but also that the trial court, in rendering judgment, proceeded on the wrong theory. Under these circumstances we believe that, error being present as detailed above, the interests of justice require that the judgment below be reversed and the cause remanded for retrial on all issues. Cf. White v. Watkins, 385 S.W.2d 267 (Tex.Civ.App.—Waco 1964, no writ). Each party shall pay one half of the costs.